Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 3450 | **DATE** | 8/11/2000 |
| **CASE TITLE** | In Re: In re Nanophase Technologies | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Motion to Dismiss the Harbour Court LP I Complaint

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons set forth in the attached Memorandum Opinion and Order, the Defendants' Motion to Dismiss the Harbour Court LP I Complaint.

*/s/ David H. Coar*

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | **Document Number** |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | AUG 1 4 2000 date docketed | |
| X | Docketing to mail notices. | | 147 |
| | Mail AO 450 form. | ED-7 FILED FOR DOCKETING docketing deputy initials | |
| | Copy to judge/magistrate judge. | 00 AUG 11 PM 5:35 | |
| MEA (lc) | courtroom deputy's initials | | date mailed notice |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In Re NANOPHASE TECHNOLOGIES CORPORATION SECURITIES LITIGATION, | ) ) ) ) ) |
| This Document Relates To: No. 98 C 7447 | ) ) ) ) No. 98 C 3450 HONORABLE DAVID H. COAR |

**DOCKETED**

**AUG 1 4 2000**

<u>MEMORANDUM OPINION AND ORDER</u>

Before this court is a motion to dismiss the class action complaint filed by the plaintiff Harbour Court LP I ("Harbour Court Plaintiffs") asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a). For the following reasons, this motion is DENIED.

**Background**

This motion to dismiss addresses one complaint that is a part of a consolidation of cases brought against Nanophase Technologies Corporation ("Nanophase") for securities fraud, No. 98 C 3450. The background of this litigation has been discussed in detail in previous opinions by this court, but will be reviewed again for clarity. The plaintiff class in the instant complaint (the "Harbour Court Complaint") is made up of holders of Nanophase preferred stock who held their stock prior to and through Nanophase's Initial Public Offering ("IPO") that occurred on November 26, 1997. (Harbour Court's Complaint ¶¶ 5, 16). Nanophase is a company that develops and markets

1



nanocrystalline materials that are used as ingredients in products such as electronics, structural ceramics, cosmetics, and industrial catalysts. (Harbour Court's Complaint ¶ 34). The defendants are a subset of the defendants in the consolidated action: Nanophase Technologies Corporation itself ("Nanophase") (Harbour Court's Complaint ¶ 17); the underwriters of the Nanophase public offering, Donaldson, Lufkin and Jenrette Securities Corporation, CIBC Oppenheimer Corporation, and Furman Selz, LLC (the "Underwriters") (Harbour Court's Complaint ¶¶ 22, 23, 24, 25, 26); and the Directors of Nanophase, Leonard Batterson, Chair of the Board, Robert Cross, Chief Executive Officer, President, and Director, and Dennis Nowak, Chief Financial Officer, Vice President, Treasurer, and Secretary (the "Directors") (Harbour Court's Complaint ¶¶ 18, 19, 20, 21).

The Harbour Court Plaintiffs, who are preferred stockholders of Nanophase, allege that Robert Cross, on behalf of Nanophase, sent the plaintiffs a package of materials in October of 1997 soliciting their support for an IPO and encouraging them to execute written consents for such an action. (Harbour Court's Complaint ¶¶ 6, 10). An IPO could only occur if two-thirds of the preferred stock holders executed written consents authorizing a series of organizational and structural changes necessary to effectuate an IPO, as well as sign an NASD Certificate. (Id.). To that end, Nanophase sent to every preferred stock holder a package dated October 30, 1997 that included a letter addressed to preferred stock holders (the "Consent Letter") that stated:

> We are pleased to advise you that on October 1, 1997, Nanophase Technologies Corporation (the "Company") filed a registration statement (the "Registration Statement") to register and offer shares of the company's common stock ("common stock") in an initial public offering (the "Public Offering").

The Consent Letter continued to specifically reference this Registration Statement as well as an accompanying Prospectus. (Harbour Court Complaint ¶¶ 7, 38). While the Consent Letter stated

2

that any preferred stock converted to common stock could not be sold for 180 days after the IPO, the IPO would probably be at $9-11 per share. (Harbour Court's Complaint ¶ 7, 38). The Consent Letter gave the Harbour Court Plaintiffs the choice of either exchanging their preferred stock at the time of the IPO for common stock or electing to opt-out of the consent and exercise appraisal rights. (Harbour Court's Complaint ¶ 39).

The Registration Statement and Prospectus stated that Nanophase was the first company to make the transition from the developmental stage to the commercial production of high-performance nanocrystalline materials. (Harbour Court's Complaint ¶¶ 8, 43). These documents stated that Nanophase had entered into collaborative agreements with industry leaders and named five different companies with whom Nanophase had entered into supply contracts, including a five-year $30 million requirements contract with Moyco Technologies, Inc. ("Moyco"). (Harbour Court Complaint ¶¶ 8, 44, 48, 49). The five contracts described in detail the purchasing schedules of the customer companies and were filed as an exhibit to the Registration Statement. (Harbour Court ¶¶ 45, 47, 55). These documents also reported dramatic revenue increases for the nine months ending September 30, 1997, and assigned the majority of this increase to "sales" to Moyco, and stated that "[s]ales to Moyco are currently expected to constitute a significant portion of [Nanophase's] revenues over the next three years." (Harbour Court's Complaint ¶¶ 8, 52, 53, 54).

All of the Harbour Court Plaintiffs signed the written consents. On November 26, 1997, the Registration Statement and Prospectus were declared effective by the SEC and Nanophase sold 4 million shares of its common stock at $8 per share through a firm commitment underwriting. Also on that day, all of the outstanding shares of the preferred stock were converted into 8,156,443 shares of Nanophase common stock. (Harbour Court's Complaint ¶ 41).

3

On January 9, 1998, only six weeks after the IPO, Nanophase issued a press release announcing that its fourth quarter 1997 and full year 1997 revenues. Fourth quarter revenues were only $1.5 million, with $1.4 million of that coming from a one-time license fee. Product sales revenue was only $100,000. No revenues were reported from the Moyco contract or any of the other contracts discussed in the Registration Statement and Prospectus. (Harbour Court's Complaint ¶¶ 57, 58). The Harbour Court Plaintiffs allege that the defendants knew of these disappointing numbers before the IPO. (Harbour Court's Complaint ¶ 57). In particular, the Harbour Court Plaintiffs allege that the defendants mischaracterized the license fee as a sale in the Prospectus and claim that the defendants knew their product was still in the development stage and not ready for commercial production. (Harbour Court's Complaint ¶ 57(b)). The plaintiffs also allege that the defendants knew Moyco was not making its purchases and had not ordered at least one-half of its 1997 minimum purchase amount by the time the Prospectus was filed. (Harbour Court Complaint ¶ 57(c, d)). In reaction to this news, the price of the common stock dropped from $11 to below $6 a share in one day. (Harbour Court's Complaint ¶ 59). At the time this complaint was filed, the stock was trading at $3 per share. (Harbour Court's Complaint ¶ 15).

The Harbour Court Plaintiffs filed this two count complaint alleging that the defendant knew or recklessly disregarded that the Registration Statement and Prospectus were materially false and misleading and the defendants knowingly and substantially participated in the issuance or dissemination of these documents. (Harbour Court's Complaint ¶ 60, 62, 63). In particular, the Harbour Court Plaintiffs allege that the Directors engaged in such a scheme in order to ensure that the Harbour Court Plaintiffs would not dissent to the IPO, to condition the market favorably to Nanophase so the IPO would be priced favorably, to protect and enhance their executive positions,

4

compensation, and prestige, and to protect and enhance the value of their own personal holdings of Nanophase. (Harbour Court's Complaint ¶ 61, 62, 63, 64). Count I alleges that the defendants violated Section 10(b) of the Security Exchanges Act (Harbour Court's Complaint ¶¶ 65-76) and Count II alleges that the Directors violated Section 20(a) of the Securities Exchanges Act through their involvement in the day-to-day operations of Nanophase, their power to control and influence these transactions, and their intimate knowledge of Nanophase's financial condition. (Harbour Court's Complaint ¶¶ 77-80).

## Standard for Motion to Dismiss

A motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure does not test whether the plaintiff will prevail on the merits, but instead whether the plaintiff has properly stated a claim for which relief may be granted. Pickrel v. City of Springfield, Ill., 45 F.3d 1115 (7th Cir. 1995). The court must accept as true all of the plaintiff's well-pleaded factual allegations, as well as all reasonable inferences. Id. Thus, the court will dismiss a complaint under Rule 12(b)(6) only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Ledford v. Sullivan, 105 F.3d 354, 357 (7th Cir. 1997) (quoting Hishon v. King & Spalding, 467 U.S. 69, 78, 104 S. Ct. 2229, 2232 (1984)). However, the court need "not strain to find inferences favorable to the plaintiffs which are not apparent on the face of the complaint." Coates v. Illinois State Bd. of Ed., 559 F.2d 445, 447 (7th Cir. 1977).

## Analysis

### II. Section 10(b) Claim

Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security . . any manipulative

5

or deceptive device or contrivance in contravention" of the rules promulgated by the SEC. Rule 10b-5 of the SEC states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
> 17 C.F.R. § 240.10B-5.

In order to state a claim under Rule 10b-5, the plaintiffs must establish that: (1) the defendants made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities (5) upon which the plaintiff justifiably relied (6) and the false statement proximately caused plaintiff's damages. Caremark, Inc. v. Coram Healthcare Corp., 113 F.3d 645, 648 (7th Cir. 1997) (citations omitted). Furthermore, the plaintiff must demonstrate the false statements influenced an "investment decision." Jordan v. Duff & Phelps, Inc., 815 F.2d 429, 437 (7th Cir. 1987).

### A. Connection with a purchase or sale of securities

The defendants argue that the Harbour Court Plaintiffs do not allege that they purchased or sold securities. Citing the Seventh Circuit's decision in Isquith v. Caremark Int'l, Inc., 136 F.3d 531, 534-36 (7th Cir. 1998), the defendants argue that the conversion of the Harbour Court Plaintiff's preferred stock into common stock by the IPO was not a purchase or sale of securities. (Dft's Mem. of Law, pp. 7-8).

Isquith can be easily distinguished from the present case. In Isquith, the defendant, Baxter

International, spun-off a formerly wholly owned subsidiary, Caremark. The class alleged that, in connection with that spin-off, Baxter International submitted a fraudulent statement to the SEC. The class members were holders of Baxter shares at the time of the spin-off. While Baxter was not required to gain the consent of the plaintiff class stock holders in order to implement the spin-off, the plaintiff class argued that if they had known of the true purpose of the spin-off, they would have blocked it in the courts. The Seventh Circuit dismissed the plaintiffs' Rule 10b-5 claim, for the plaintiffs did not buy or sell shares in Caremark, but received one share of Caremark stock as a dividend for every four shares of Baxter stock they owned. 136 F.3d at 534. However, the key to the Seventh Circuit's analysis in the Isquith case is the concept of choice by the plaintiff class. In discussing the definition of a "purchase" and a "sale," the Seventh Circuit stated:

> "[Securities laws] create a remedy . . . for someone who is induced by ('relied on,' the courts usually say) a misrepresentation or a misleading omission to buy or sell a stock. . . This presupposes that the someone had a choice, a choice distorted by the fraud. The members of the class in this case had no choice. They made no investment decision. They therefore cannot have been induced by the alleged fraud to buy or sell any securities even if the spinoff can somehow be thought of as effecting a sale of their shares in Baxter."
> 136 F.3d at 534 (citations omitted).

In Isquith, Baxter did not require the consent of the plaintiff class stock holders in order to implement the spin-off. However, in the present case, the defendants were required to gain the written consent of the Harbour Court Plaintiffs in order to effectuate the structural changes necessary for the IPO. The Harbour Court Plaintiffs did have a choice–they could have either exchanged their preferred stock for common or they could have opted out and received the cash value for their shares–and thus they had to make an investment decision. Therefore, the Harbour Court Plaintiffs have alleged that the defendants made fraudulent statements were in connection with a purchase or sale of securities.

7

### B. Reliance on false statements

The defendants argue that the Harbour Court Plaintiffs did not allege that they ever received or read the Registration Statement or Prospectus, the documents that included the allegedly false statements, before the IPO on November 26, 1997. However, the complaint clearly states that the October 30, 1997 Consent Letter to the Harbour Court Plaintiffs referenced and discussed the Registration Statement and Prospectus. (Harbour Court's Complaint ¶¶ 7, 8, 14). The Consent Letter also states that the Registration Statement was filed with the SEC on October 1, 1997. (Harbour Court's Complaint ¶ 7). Finally, the Harbour Court Plaintiffs allege that in reliance on the false and misleading statements in the Registration Statement and the Prospectus, as well as the defendants' failure to disclose falling revenues, they executed the written consents for the structural changes necessary for the IPO. (Harbour Court's Complaint ¶ 14). This is more than adequate pleading of reliance by the plaintiffs.

### C. Causation of Injuries

Under Rule 10b-5, the plaintiffs must plead both transaction causation and loss causation. Caremark, 113 F.3d at 648 (citations omitted). To plead transaction causation, the plaintiffs must allege that they would not have invested in the instrument if the defendants had stated truthfully the material facts at the time of the sale; to plead loss causation, the plaintiffs must allege that it was the very facts about which the defendants lied which caused their injuries. Id. The defendants argue that the Harbour Court Plaintiffs have not alleged loss causation, for they have not alleged that "but for the circumstances that the fraud concealed, the investment that they were induced to make would not have lost its value." (Dft's Mem. of Law, p. 15, quoting Bastian v. Petren Resources Corp., 892 F.2d 680, 683 (7th Cir. 1989)).

8

The Harbour Court Plaintiffs clearly have alleged loss causation. The complaint includes allegations that the Registration Statement and Prospectus contained information that the defendants had five different sales contracts, including a five year $30 million contract. The Registration Statement and Prospectus also reported dramatic revenue increases from the previuos nine months and stated that sales to Moyco were expected to continue for the next three years. However, on January 9, 1998, only six weeks after the IPO and within the 180 day lock-in period, a press release from the defendants reporting significantly lower revenues and no sales from any of the five sales contracts caused the price of the common stock to plummet from $11 to $6 a share. Therefore, the Harbour Court Plaintiffs have alleged that but for the false and misleading statements by the defendants on the five sales contracts, predicted revenues, and the contract and sales with Moyco, within the Registration Statement and Prospectus, the common stock would not have lost its value. No more detailed calculation of damages is needed to give the defendants notice. See Williams v. Sabin, 884 F.Supp. 294, 297 (N.D.Ill. 1995).

**D. Scienter**

Allegations of fraud under Rule 10b-5 must satisfy Federal Rule of Civil Procedure 9(b), which requires that "the circumstances constitutin fraud . . . be stated with particularity." Fed.R.Civ.P. 9(b). The Seventh Circuit has found that the circumstances of fraud in a 10b-5 claim must be pled "in detail." DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990). In particular, the plaintiffs must adequately plead the scienter requirement of a 10b-5 claim. Scienter is defined as a "mental state embracing intent to deceive, manipulate, or defraud." Ernst & Young v. Hochfelder, 425 U.S. 185, 194 n. 12, 96 S.Ct. 1375, 1381 n. 12 (1976). Under the Private Securities Litigation and Reform Act of 1995 ("PSLRA"), which amended the Securities Exchange Act of

9

1934, the pleading standard for scienter in securities fraud cases was made more rigorous, beyond mere Rule 9(b) requirements. See 15 U.S.C. § 78u-4(b)(2). Pursuant to the PSLRA, in order to sufficiently allege scienter, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). If the complaint fails to do so, dismissal is required. 15 U.S.C. § 78u-4(b)(3)(A); Rehm v. Eagle Finance Corp., 954 F.Supp. 1246, 1251 (N.D.Ill. 1997). Scienter may be established: "(a) by alleging facts to show that the defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Rehm, 954 F.Supp. at 1253 (citing Shields v. Citytrust Bancorp, Inc., 24 F.3d 1124, 1128 (2d Cir. 1994).

The Harbour Court Plaintiffs plead scienter through circumstantial evidence of defendants' recklessness. In the Consent Letter, Registration Statement and Prospectus, the defendants allegedly reported dramatic increases in revenues, stating the majority of the increase was from sales to Moyco. The materials continued to state that these sales to Moyco would continue for the next three years and supported this statement with a five year, $30 million requirements contract. The defendants supported their statement of future revenues with detailed descriptions of five supply contracts. The Harbour Court Plaintiffs also allege that at the time of the IPO, the defendants knew that the fourth quarter revenues would be disappointing because these customers had purchased little or no Nanophase materials during that quarter. The plaintiffs also allege that the defendants purposely mischaracterized fees as "sales" in order to inflate revenue numbers. These plaintiffs have done more than speculate as to the defendants' motives or make conclusory allegations of scienter; they have alleged specific facts that the defendants were purposely trying to cover dismal revenue

numbers in order to gain support for the IPO and to inflate the stock price. Rehm, 954 F.Supp. at 1255, citing Sheilds, 25 F.3d at 1129. The Harbour Court Plaintiffs have alleged that the defendants recklessly disregarded their non-existent sales to Moyco and other customers when constructing the Registration Statement and Prospectus. Therefore, the Harbour Court Plaintiffs have satified the requirements for scienter. See also, In re Next Level Systems, Inc., 1999 U.S. Dist. LEXIS 5653, * 29-30 (N.D.Ill. 1999).

The Harbour Court Plaintiffs have satisfied their burden to plead facts with particularity under Rule 9(b) of the Federal Rules of Civil Procedure and has pled the necessary elements of a Section 10(b) and Rule 10b-5 claim. Therefore, the defendants' motion to dismiss as to Count I is denied.

## II. Section 20(a) Claim

Section 20(a) of the Securities Exchange Act provides that every person who, directly or indirectly, controls any person liable under the Securities Exchange Act shall be liable jointly and severally for the misconduct of the controlled person. 15 U.S.C. § 78t(a). To plead control person liability, the plaintiffs must adequately allege that each "control person" participated in or exercised control over the company in general and that he or she possessed the "power or ability to control [the specific] transactions upon which the primary violation was predicated," whether or nt that power was exercised. Harrison v. Dean Witter Reynolds, Inc., 974 F.2d 873, 881 (7th Cir. 1992). The Harbour Court Plaintiffs allege that the Directors had day-to-day control over the daily operations of Nanophase, had the power to control and influence the particular transactions in question, and had intimate knowledge of Nanophase's financial condition. This is sufficient for the purposes of a Section 20(a) claim. In re Discovery Zone Sec. Litig., 943 F.Supp. 924, 943 (N.D.Ill. 1996).

## Conclusion

For the foregoing reasons, the defendants' motion to dismiss the class action complaint filed by the plaintiff Harbour Court LP I of claims arising under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a) is DENIED.

Enter:

_David H. Coar_
David H. Coar
United States District Judge

Dated: